**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:22-cr-00149 (JEB)** |
| **v.** | : | |
| | : | |
| **ANASTHASIOS ZOYGANELES,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.  For the reasons set forth herein, the government requests that this Court sentence Defendant Anasthasios Zoyganeles to thirty days' incarceration, thirty-six months' probation, sixty hours of community service, and $500 in restitution.

I.   **Introduction**

Defendant Athanasios Zoyganeles, a forty-five-year-old delivery driver from Chicago, Illinois, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than $2.8 million in losses.[1]

---

[1] Although the Statement of Offense in this matter, filed on July 1, 2022, reflects a sum of more than $1.4 million dollars for repairs, (ECF No. 22 at 2), as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Defendant Zoyganeles pled guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G).  As explained herein, a sentence of incarceration is appropriate in this case because (1) Zoyganeles posted inflammatory remarks on his social media account before and after the events of January 6th, including telling other people that they needed to "rush" and "storm" the Capitol in the days leading up to the event; (2) Zoyganeles was present at the front of a group that entered the Capitol through the Senate Fire Door near the Parliamentarian's Office; (3) Zoyganeles armed himself with a piece of wood as he approached the Capitol; (4) Zoyganeles entered a number of offices once inside the Capitol, including the Parliamentarian's Office and senators' offices; and (5) as of the time of this filing, Zoyganeles has not expressed remorse for his actions on January 6th and has instead described the incident as "fun and exciting."

The Court must also consider that Zoyganeles's conduct on January 6th, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who trying to prevent a breach of the Capitol Building, and disrupt the proceedings.  Here, the facts of and circumstances of Zoyganeles's crime support a sentence of thirty days' incarceration, thirty-six months' probation, sixty hours of community service, and $500 in restitution in this case.

## II.  Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol.  *See* ECF No. 22 at 1–3.

### The Defendant's Activity Before January 6th

On December 21, 2020, Zoyganeles sent a message on Facebook saying, "Let me know when u figure it out.  I gotta let my work know.  Im down for whatever.  Its time to take this

country back." [Sic.]  The following day, Zoyganeles posted, "This is what needs to happen in Washington D.C.on the 6th.just rush Capital hill.They can't stop a million people.We the people are in charge.Not our evil government."  [Sic].  ECF No. 22 at 3.

On January 4, 2021, Zoyganeles left Chicago, Illinois, with another individual and drove to Washington, D.C.  *Id.*  He arrived in Washington on January 5, 2021.  *Id.*  At approximately 11:58 p.m. that evening, Zoyganeles commented on a Facebook post, saying "We need to take over the capital [sic] hill."  *Id.* at 4.  At 12:01 a.m., on January 6, 2021, Zoyganeles commented on another post saying, "we need to take over the capital [sic] building tomorrow."  *Id.*

*Defendant Zoyganeles's Role in the January 6, 2021 Attack on the Capitol*

At approximately 11:12 a.m. on January 6, 2021, Zoyganeles posted a video to his Facebook account of crowds at the "Stop the Steal" rally, with the comment "Just some of the millions that are here."  Image 1, below, shows Zoyganeles's Facebook post.



Image 1

At approximately 12:53 p.m., Zoyganeles posted a video on his Facebook of a crowd moving from the "Stop the Steal" rally to the Capitol, with the caption "Its getting heated [sic]." Image 2 shows a screenshot of the video, as well as Zoyganeles's comment.



Image 2

Meanwhile, Zoyganeles was also posting on Facebook, telling people that they had to "fight" for their freedom, as shown in Image 3.



Image 3

Zoyganeles then entered the restricted grounds of the Capitol, walking up the stairs under the inaugural scaffolding.  Image 4 shows Zoyganeles, holding the scaffolding as he walks towards the Northwest side of the Capitol.



Image 4

At the Northwest Plaza of the Capitol, Zoyganeles stood outside a fire door, next to the Senate Parliamentarian's Office.  Image 5 shows Zoyganeles (circled in yellow), standing next to the fire door.  Image 6 provides a zoomed-in version of the same image, showing Zoyganeles smoking while he holds a large piece of wood.



Image 5



Image 6

At approximately 2:46 p.m., Zoyganeles entered the Capitol through that Senate Fire Door, next to the Parliamentarian's Office.  Image 7, which is a screenshot of security camera footage from inside the Capitol, shows Zoyganeles (circled in red) entering.



Image 7[2]

Zoyganeles then entered some of the offices located near that entrance, including the Parliamentarian's Office and other restricted spaces.  He took photos or videos with his phone and smoked, as shown in Images 8 and 9.[3]

---

[2] The time stamp is in Coordinated Universal Time.  In Eastern Standard Time, the time is 2:46:56 p.m.

[3] Zoyganeles's phone was seized at the time of his arrest.  At that time, the photos and videos that Zoyganeles appears to be taking in the security camera footage from inside the Capitol were not saved on his phone.



Image 8                                     Image 9

Zoyganeles remained near the Parliamentarian's Office, until he left the Capitol through

the Senate Fire Door at approximately 2:51 p.m., as shown in Image 11.



Image 11

On January 6, another Facebook user asked Zoyganeles "R U OK" [Sic].  Zoyganeles

responded at approximately 4:39 p.m., saying "No I rushed the capital [sic] and lost everyone I

was with." ECF No. 22 at 4.  He continued, "No im done i was teargassed maced and they were throwing flash bangs at me but I still stayed on the front lines.  It wasn't easy but we did it."  [Sic]. *Id.*

### Zoyganeles's Social Media Posts After January 6th

In the days after January 6th, Zoyganeles posted several comments and messages on Facebook, referencing the Capitol siege.  On January 7, 2021, he posted on Facebook, "The only violence I saw was cops shooting people with bean bags spraying mace.Releasing tear gas on the people and beating them with billyclubs.  [sic]." ECF No. 22 at 4.  On that same day, Zoyganeles commented on a post, saying, "They are trying to remove Trump anyway they can.The people showed the government.That we will take u out if needed.Are u happy?Your vote dont mean shit no more.I don't wanna hear garbage like that."  [Sic].  *Id.* at 5.  On January 8, 2021, Zoyganeles replied to a comment on Facebook, saying, "Yeah, I was busy at the capital building."  [Sic].  *Id.* On January 15, 2021, when asked on Facebook about his trip to Washington, D.C., Zoyganeles replied that it was "fun and exciting."  *Id.*  On April 2, 2021, Zoyganeles posted an article about two officers who were killed after a vehicle rammed into a barricade outside of the Capitol.  The Defendant said, "Being a capital police officer is a dangerous job.Now that the peopleknow.We have an evil government."  [Sic].  *Id.*

### Zoyganeles's Post-Arrest Interview with Chicago CBS

On February 22, 2022, Zoyganeles spoke with a reporter from Chicago CBS 2.  In the video, Zoyganeles admitted that he was at the Capitol on January 6, 2021, but denied entering the building.

*The Charges and Plea Agreement*

On February 18, 2022, the United States charged Zoyganeles by criminal complaint with violating 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D), and 40 U.S.C. § 5104(e)(2)(G).  ECF No. 1.  On February 22, 2022, law enforcement officers arrested Zoyganeles at his apartment in Chicago, Illinois.  ECF No. 5.  He declined to speak with the arresting agents at the time of his arrest.

On April 29, 2022, the Government filed a four-count Information, charging Zoyganeles with the violations identified in the criminal complaint.  ECF No. 17.

On July 1, 2022, pursuant to a plea agreement, Zoyganeles pled guilty to Count Four of the Information, charging him with parading, demonstrating, or picketing in a Capitol building in violation of 40 U.S.C. § 5104(e)(2)(G).  ECF No. 21.  By plea agreement, he agreed to pay $500 in restitution to the Department of the Treasury.  *Id.* at 6.

On August 3, 2022, Zoyganeles moved to withdraw his guilty plea, arguing that newly discovered evidence would have impacted his decision to plead guilty.  ECF No. 23 at 2.  After finding that Zoyganeles had failed to provide any details about this alleged newly discovered evidence, ECF No. 28 at 4–5, the Court denied the motion, *id.* at 7.

**III.  Statutory Penalties**

Zoyganeles now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G).  As noted by the plea agreement and the U.S. Probation Office, he faces up to six months of imprisonment and a fine of up to $5,000.  He must also pay restitution under the terms of his plea agreement.  *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).  As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## IV.   Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of thirty days' incarceration, thirty-six months' probation, sixty hours of community service, and $500 in restitution.

### A.   The Nature and Circumstances of the Offense

The attack on the U.S. Capitol "on January 6 posed a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Zoyganeles's participation in that attack to fashion a just sentence, the Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Zoyganeles, the absence of violent or destructive acts is not a mitigating factor. Had Zoyganeles engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Zoyganeles's case is the fact that he traveled to Washington, D.C., and entered the Capitol prepared for, and expecting, violence. In the days

leading up to January 6th, his Facebook posts indicate that he was anticipating violence.  In the weeks before he traveled to Washington, D.C., he posted that people had to "just rush Capital [sic] hill," and said that the people would be "storming Washington D.C. on the 6th."  ECF No. 21 at 3. On the evening before he unlawfully entered the Capitol, he posted, "We need to take over capital [sic] hill" and "we need to take over the capital [sic] building tomorrow."  *Id.* at 4.

Once he was on Capitol Grounds, Zoyganeles carried a large piece of wood while he waited outside the Capitol.  Although he was not directly involved in any physical altercation, his rhetoric and the fact that he was present at the front of a group that waited near the Senate  Fire Door, armed with a large piece of wood, demonstrate that he was ready to engage in violence.  Later, despite having seen the violent takeover of the Capitol, Zoyganeles still posted on his Facebook account, bragging about being at the Capitol.  He messaged people that he was "teargassed maced and [that the police] were throwing flash bangs" at him.  *Id.*  After describing the police resistance, he bragged that he "stayed on the front lines."  *Id.*  Additionally, Zoyganeles minimized the events of January 6th, posting "Yea I was busy at the capital [sic] building" and described the events as "fun and exciting."  *Id.* at 5.  Having been part of the riot, Zoyganeles did not regret his conduct, but bragged about it.

When describing the police resistance and his being at the "front lines," he said, "It wasn't easy but we did it."  *Id.* at 4.  He willfully intended to disrupt the democratic process in certifying the results of the 2020 election.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

**B.      The History and Characteristics of Zoyganeles**

As set forth in the PSR, Zoyganeles's criminal history consists of a misdemeanor conviction for battery.  ECF No. 32 at 7.  The Defendant, age 45, has two prior arrests for battery, one in 2004 and one in 2016, both of which appear to have been resolved through diversionary programs.  *Id.* at 8–9.  He also has a 1998 DUI arrest that was resolved through a diversionary program.  *Id.*  Despite not having a serious criminal history, his actions during the January 6th riot and his lack of remorse indicate a need for a sentence that provides deterrence, as discussed further below.

**C.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation.  I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

**D.      The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant.  18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration.  "Future would-be rioters must be deterred."  *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 (statement of Judge Nichols at sentencing).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence.  *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others?  Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur.  And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again.").  This was not a protest.  *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss).  And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences.  There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

As more fully discussed above, the facts of this case, including Zoyganeles's violent rhetoric before and after the Capitol attack, as well as his simultaneous attempts to minimize the violence that took place on that day, strongly weigh in favor of a sentence that will specifically deter him from participating in any potential future violence. His post-January 6th social media posts indicate that he may be inclined to engage in similar unlawful conduct in the future. Additionally, as of the time of this filing, Zoyganeles has not expressed any remorse for his actions. It is therefore necessary that the sentence imposed specifically deter him from attempting to unlawfully or violently interfere in any future democratic elections.

**E.      The Need to Avoid Unwarranted Sentencing Disparities**

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[4] This Court must sentence Zoyganeles based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6th riot.

Zoyganeles has pled guilty to Count Four of the Information, charging him with parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to

---

[4] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection."  18 U.S.C. § 3553(a).  Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted.  *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006).  "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences."  Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.*  Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan).

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr. at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

Although the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

- *In United States v. Oliver Sarko*, 1:21-cr-00591, the court imposed a sentence of thirty days' incarceration and thirty-six months' probation where the defendant recorded himself outside the Capitol, exclaiming that he was "storming" the building, and entered sensitive spaces.

- *In United States v. Nolan Kidd,* 21-cr-429, the court imposed a sentence of 45 days' incarceration, where the defendant (1) observed, filmed, and cheered when a mob of rioters swarmed through a police line on the Upper West Terrace Staircase before he entered the Capitol building; (2) entered the Capitol building despite having been sprayed with tear gas three times by police officers; (3) was part of the first group of rioters to enter the Capitol building on January 6, and entered through the Senate Fire Door less than 20 seconds after it was opened by other rioters; (4) spent approximately 40 minutes inside the Capitol building; (5) gave an interview shortly after exiting the Capitol building and sent messages on social media that displayed a total lack of remorse, including referring to himself as a "stormtrooper" and bragging that he "went farther than almost anyone into the building"; and (6) subsequently tried to hide evidence of his participation in the riot because the "FBI are trying to identify anyone that got inside," and he also provided false or misleading information to law enforcement about the riot.  Similar to Kidd, Zoyganeles observed the mob of rioters on the West side of the Capitol and entered despite having seen the police deploy tear gas against rioters (Kidd himself was tear gassed, while Zoyganeles bragged that he was tear gassed, whether or not he actually was); Zoyganeles was one of the first to enter through the Senate Fire Door; after the riot, Zoyganeles made social media posts displaying a complete lack of

remorse or regret; and Zoygneles lied about being inside the Capitol when interviewed by the media after January 6. Unlike Kidd, Zoyganeles was inside the Capitol five minutes, not 40 minutes, and he did not provide false or misleading evidence to law enforcement, and these distinctions support the government's request for a lesser sentence (30 days' incarceration) than was imposed on Kidd (45 days' incarceration).

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the Government recommends that this Court sentence Defendant to thirty days' incarceration, thirty-six months' probation, sixty hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters

future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     /s/  *Thomas Campbell*
        Thomas D. Campbell
        Trial Attorney
        Criminal Division, Fraud Section
        U.S. Department of Justice
        1400 New York Ave. NW
        Washington, DC 20005
        Tel: (202) 262-7778
        Email: thomas.campbell@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

On this 19th day of January, 2023, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

By:    <u>/s/  *Thomas Campbell*</u>
Thomas D. Campbell
Trial Attorney
Criminal Division, Fraud Section
U.S. Department of Justice
1400 New York Ave. NW
Washington, DC 20005
Tel: (202) 262-7778
Email: thomas.campbell@usdoj.gov